**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**
**CIVIL ACTION NO. 4:11-CV-00114-M**

**WESTERN KENTUCKY ROYALTY TRUST**                    **PLAINTIFF**

**V.**

**ARMSTRONG COAL RESERVES, INC., et al.**                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment [DN 31].

Also before the Court is Plaintiff's Motion for Partial Summary Judgment [DN 35] and its Motion

to Strike [DN 66]. Fully briefed, these matters are ripe for decision.

### I. BACKGROUND

Plaintiff, the Western Kentucky Royalty Trust ("WKRT"), is a trust for which Samuel S.

Francis is the trustee. Francis has been in the business of acquiring and selling coal properties for

over thirty years. In the fall of 2006, Francis began acquiring various mining properties located in

Muhlenberg and Ohio Counties for what became known as the Armstrong Project. In consideration

of Francis's role in the acquisition of these properties, various companies affiliated with the

Armstrong Project granted Plaintiff an overriding royalty on certain coal that was mined and sold

from the properties.

Thereafter, a dispute arose between the parties. As a result, Francis sued Defendants on July

16, 2008. In order to settle their dispute, the parties entered into a Settlement Agreement on July

25, 2008. As to the payment of royalties, § 9 of the Settlement Agreement provides as follows:

> **AMENDED AND RESTATED ROYALTY AGREEMENTS:** Amended and restated royalty
> agreements, and short forms for recording thereof, shall be executed by WKRT and
> the Armstrong Parties, as applicable, granting a royalty to WKRT: (a) in the amount
> of 0.5% of the gross sales price as defined in WKRT Royalty Agreements with
> respect to the coal reserves acquired as part of the four "Peabody Transactions"

which closed on September 19, 2006, December 10, 2006, March 31, 2007 and May 31, 2007, respectively; (b) in the amount of $0.15 per ton on any other coal reserves acquired by the Armstrong Parties prior to March 31, 2008; and (c) in the amount of $0.15 per ton on the coal reserves acquired by Ceralvo as part of the "Elk Creek" transaction on March 31, 2008 (collectively, the "Amended WKRT Royalty Agreements"). The Amended WKRT Royalty Agreements, specimen forms of which are attached as Exhibit 6, shall supersede and replace the WKRT Royalty Agreements in their entirety. The Francis Parties shall acknowledge and agree that other than as set forth above, they are not owed any additional royalties by the Armstrong Parties, and shall not be entitled to any royalty payments related to any coal reserves or properties acquired in the future by the Armstrong Parties.

As required by the Settlement Agreement, the parties executed restated royalty agreements. There are two separate restated royalty agreements; however, there are four separate royalty grants. One grant is from Western Diamond, LLC, one is from Western Land Company, LLC, one is from Armstrong Coal Company, and one is from Ceralvo Holdings. Each royalty grant provides for an overriding royalty on "**all coal hereafter mined or extracted and subsequently sold from all of the coal reserves and real property described in, and conveyed, demised or otherwise granted in or under, the following deeds and instruments**." Each separate royalty grant specifically lists deeds and instruments which comprise the property interests subject to the overriding royalty. These interests will be referred to at times herein as the "included properties."

The highlighted language is at the center of the present dispute. This breach of contract action was filed because Defendants have refused to pay royalties pursuant to Plaintiff's interpretation of the Royalty Agreements. Plaintiff maintains that the Royalty Agreements entitle it to the payment of multiple royalties in some instances. As an example, Plaintiff claims that "if coal is mined from the Ceralvo royalty grant's Included Reserves" and is later "removed from the ground (extracted) through a portal on surface property covered by the separate Western Diamond royalty grant" or "processed and shipped (extracted) from a preparation plant . . . on surface property

2

described in the Western Land grant," then a multiple royalty would be paid: one reflecting the mining of the coal reserves pursuant to the Ceralvo grant and the other reflecting the distinct and separate use of the surface property included in the Western Diamond or the Western Land grant. (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [DN 35-2] 6–7.)  Plaintiff also claims that the Royalty Agreements require the payment of royalties any time that coal is mined from, or extracted through, a property referenced in the grants, regardless of whether Defendants owned the coal reserves when the Royalty Agreements were executed on July 25, 2008.  Plaintiff thus asserts that it is entitled to royalty payments on certain subsequently-acquired properties.  (Id. at 9.)

In response, Defendants contend that they are only required to pay a single royalty on a given load of coal.  Defendants also contend that they are not obligated to pay royalties if the coal is mined from subsequently-acquired reserves.  The parties have filed cross-motions for summary judgment. These motions are addressed below.

## II. STANDARD OF REVIEW/LAW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt

as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

The issues raised in the parties' cross-motions for summary judgment are governed by principles of contract interpretation. Under Kentucky law, "the construction and interpretation of a contract including questions regarding ambiguity are questions of law to be decided by the Court." Hulda Schoening Family Trust v. Powertel/Kentucky Inc., 275 F. Supp. 2d 793, 794 (W.D. Ky. 2003) (citation omitted). "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." Logan Fabricom, Inc. v. AOP P'ship LLP, 2006 WL 3759412, at *2 (Ky. App. Dec. 22, 2006). A court's analysis thus begins with a contract's four corners. See 3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist., 174 S.W.3d 440 (Ky. 2005) (noting that when no ambiguity in a contract exists, a court should look "only as far as the four corners of the document to determine the parties' intentions"). As a rule, a contract "must be construed as a whole, giving effect to all parts and every word in it if possible." Am. Dairy Queen Corp. v. Fortune St. Research & Writing Inc., 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010).

"[I]n the absence of ambiguity a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and

without resort to extrinsic evidence." Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 106 (Ky. 2003). If a contract is ambiguous, however, a court may "consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." Wolf River Oil Co. v. Equity Grp.-Ky. Div., LLC, 2010 WL 427775, at *2 (W.D. Ky. Feb. 3, 2010) (quoting Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 385 (Ky. App. 2002)).

The fact that the parties disagree about a contract's interpretation does not mean that it is ambiguous. See B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 594 (6th Cir. 2001) (noting that "disputed issues of contractual interpretation can be resolved at summary judgment on the basis that they are questions of law"); see also Cantrell Supply, Inc., 94 S.W.3d at 385 (noting that "[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms"). Instead, a contract is ambiguous only "if it can be reasonably interpreted to support two different positions." Albert M. Higley Co. v. N/S Corp., 445 F.3d 861, 865 (6th Cir. 2006). Once a court determines that a contract is ambiguous, "areas of dispute concerning the extrinsic evidence are factual issues" and contract construction becomes "subject to resolution by the fact-finder." Rite Aid of Ky., Inc. v. Foursome Props., LLC, 2011 WL 3516851, at *2 (Ky. App. Aug. 12, 2011).

### III. DISCUSSION

#### PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT [DNS 31, 35]

The parties dispute two issues relating to the Royalty Agreements: (1) whether Plaintiff is entitled to multiple royalties for certain coal that is mined or extracted and subsequently sold from the included properties; and (2) whether, under any circumstances, Plaintiff is entitled to royalties

5

for coal that is mined or extracted and subsequently sold from properties that were subsequently-acquired by Defendants after July 25, 2008.

### A. MULTIPLE ROYALTIES

Plaintiff argues that the language and structure of the Royalty Agreements unequivocally indicate the parties' intent to base Plaintiff's overriding royalty payments on separate, cumulative royalty triggering events. Defendants, by contrast, argue that under the Royalty Agreements' clear and unambiguous language and structure, Plaintiff is not entitled to multiple royalty streams and is instead limited to receiving one royalty on any given load of coal.

To understand this dispute, it is necessary to understand the nature of the property interests which make up the included properties that are subject to overriding royalty payments. Some of the included properties consist of coal reserves that have been severed from the surface interest. (See, e.g., Aff. of David R. Cobb, Ex. A-4.) Some of the included properties consist of fee simple interests, where the party fully owns the surface and all of the underlying minerals. (See, e.g., id. Ex. A-18.) Some of the included properties consist of surface tracts only, subject to "coal mining rights." (See, e.g., id. Ex. A-3.) The surface-only tracts have various coal reserves underlying them.

As to multiple royalties, the dispute centers mainly on the use of the surface-only tracts that are listed as included properties in the Royalty Agreements. For instance, Plaintiff concedes that if coal is mined from Ceralvo coal reserves, it is entitled to only one royalty as long as the surface properties identified in the other three grants are not used to produce or sell the coal. But Plaintiff asserts that if that same Ceralvo coal is extracted through a portal located on a surface property listed in the Western Diamond grant, or if it is processed and shipped from a preparation plant located on a surface property listed in the Western Land grant, then a dual royalty would be due: one reflecting

6

the mining of the reserves under the Ceralvo grant and one reflecting the use of the surface property included in the Western Diamond or Western Land grant.  This interpretation is based largely on three phrases: (1) "coal reserves and real property"; (2) coal "mined or extracted"; and (3) "overriding royalty."  Therefore, the Court will begin by addressing this language.

### 1. "Coal Reserves and Real Property"

In support of its position that it is entitled to payment for the use of the surface-only tracts that are included in the royalty grants, Plaintiff highlights the phrase "real property."  (See Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [DN 35-2] 19–21.)  Contracts should not be construed "so as to reject any words as surplusage if they reasonably can be given meaning," _In re_ Rust of Kentucky, Inc., 439 B.R. 409, 412 (Bankr. W.D. Ky. 2010), and Plaintiff asserts that limiting royalty payments to only coal reserves would render the parties' references to "real property" meaningless. Plaintiff asserts that the surface-only properties in the Royalty Agreements are obviously "real property" from which coal can be mined or extracted.  If the parties did not intend a royalty to be due upon use of surface properties, they would not have listed the surface-only tracts in the Royalty Agreements.  (See WKRT's Reply in Supp. of its Mot. for Partial Summ. J. [DN-53] 3.)

Defendants, by contrast, assert that the Court should not read the parties' references to "real property" synonymously with the phrase "surface property."  Instead, Defendants maintain that the phrase "coal reserves and real property" was necessary to encompass not only the coal reserves that had already been severed from properties but also the coal reserves that had not yet been severed from properties.  In other words, Defendants urge the Court to conclude that the references to "real property" merely recognize the fact that some of the listed documents convey coal reserves that are not severed from the surface property.  (See Defs.' Reply in Supp. of their Mot. for Summ. J. [DN

56] 9–10.)  Defendants propose that the phrase "real property" includes **all** incidents of property ownership–including ownership of the surface, the coal reserves, and the "coal mining right" that permits extraction of the reserves (via the surface or by underground mining)–and that the term was used in the Royalty Agreements since the term "coal reserves" would not have accurately described all of the listed instruments.  Importantly, Defendants never adequately explain in their briefs why it was necessary for the parties to list the surface-only properties in the Royalty Agreements if they did not intend for such properties to generate royalties.  At oral argument, Defendants only suggested that the documents were listed to identify the universe of property in which the relevant coal reserves could be found.

The Court, after careful consideration of the listed deeds and instruments, finds that the parties' references to "real property" are unambiguous and must be construed as encompassing both the listed fee simple property interests **and** the listed surface-only tracts.  As a rule, contracts must be construed consistent with common sense and in a manner that avoids absurd results.  See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 545 (6th Cir. 2007).  It is absurd to conclude that the references to "real property" somehow exclude the listed surface tracts.  However, while the parties' references to "real property" plainly include the surface-only tracts, the Royalty Agreements provide that a royalty will be paid only when coal is "mined or extracted and subsequently sold" from such property.  The Court must therefore determine what the parties intended by the phrase "mined or extracted and subsequently sold."

**2. "Mined or Extracted and Subsequently Sold"**

The Royalty Agreements provide for royalty payments on coal that is "mined or extracted and subsequently sold" from the listed coal reserves and real properties.  Plaintiff argues that the

Court should read the phrase "mined or extracted" to refer to distinct events, each of which is subject to the payment of a separate royalty. (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [DN 35-2] 20.) According to Plaintiff, the term "mining" commonly describes the entire process of putting coal into marketable form. See Merriam-Webster Online Dictionary, available at http://www.merriam-webster.com/dictionary/mining (defining "mining" as "the process or business of working mines"). To avoid any narrower interpretation of the term, the parties provided that the subsequent extraction of mined reserves would trigger payment of a royalty–so long as the extraction burdens a listed surface tract. Specifically, Plaintiff asserts that the parties' deliberate use of the term "extracted" shows their intention to trigger a royalty payment when coal is: (1) removed from the ground through a portal on the surface of one of the described tracts; (2) removed from surrounding waste material at a preparation plant located on one of the described tracts; or (3) removed from stockpiles for shipment from one of the described tracts. (See Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [DN 35-2] 20; WKRT's Mem. in Opp. to Defs.' Mot. for Summ. J. [DN 41] 26.) In this regard, Plaintiff suggests that the process of mining or extraction does not end when an operator removes coal from its seam. Instead, coal can be mined or extracted from surface-only tracts.

Defendants, by contrast, make three counter-arguments. First, Defendants contend that the phrase "mined or extracted" refers to the severance of coal from the mineral estate–and that it does not apply to surface estates because there are no minerals in the surface. In support, Defendants rely on Davis v. Director, Office of Workers Comp. Programs, in which the Sixth Circuit upheld an ALJ's decision that transporting coal across the surface was not directly related to the "extraction or preparation of coal" for purposes of the Mine Act. 892 F.2d 79, 1989 WL 153149, at *2 (6th Cir. Dec. 19, 1989). Second, Defendants contend that the terms "mined" and "extracted" are often

defined with reference to each other, such that coal cannot be mined unless it is also extracted–and that the Court should thus conclude that mining and extraction are not separate events subject to separate royalty payments.  Third, Defendants contend that coal can only be mined or extracted once and that once coal is severed from its seam, the act of mining or extraction is complete.  Defendants suggest that this final argument follows the court's opinion in Galgay v. Gil-Pre Corp., 864 F.2d 1018 (3d Cir. 1988).  There, the court interpreted a contract providing for royalties on coal "produced for use or for sale" to require a royalty when coal was "first made marketable or usable as fuel."  Id. at 1021.  In so doing, the court adopted the rationale of Thomas v. Blue Coal Corp., 355 F. Supp. 510 (M.D. Pa. 1973), finding that its interpretation was "not only consistent with the language of the agreement but also necessary to avoid liability for multiple royalties on the same coal."  Id.

Under Kentucky law, courts should give effect to every word in a contract, if possible.  See Am. Dairy Queen Corp., 753 F. Supp. 2d at 679.  In this case, the parties chose to use two words to describe the removal of minerals from the ground: "mined" and "extracted."  The Court finds that one word would have been sufficient if the two words' meanings were meant to be synonymous.  But if the parties' intent was to provide a separate royalty when coal mined from reserves is extracted through a portal located on a surface-only tract, then using both words makes perfect sense.  In that instance, the word "extracted" takes on a separate, distinct meaning from the word "mined."  Thus, both words are given effect.  If the parties had not used the words "or extracted," then the effect of the language would be exactly as Defendants suggest–as coal cannot be mined from surface property.  As written, however, the parties did use the words "or extracted."  Thus, the Royalty Agreements' plain and unambiguous terms require a construction that does not equate

10

mining with extraction.

If the Court were to adopt Defendants' position and equate mining with extraction, it would be forced to conclude that the parties listed surface-only properties in their grants that could **never** generate royalty payments.  The Court refuses to accept such a notion.  If the parties only intended royalties to be paid only when coal reserves were mined, they would not have listed surface-only tracts in their grants or used the words "or extracted" to describe the events that trigger royalty payments.  Under the Royalty Agreements' plain terms, Plaintiff is entitled to a royalty when coal is extracted from a listed surface-only tract.

At this juncture, the Court wishes to address Defendants' argument that the parties listed the surface-only tracts in the grants merely to identify the universe of property in which relevant coal reserves would be found.  This argument is based largely on the belief that the Royalty Agreements must be read in light of the Settlement Agreement, and the Settlement Agreement mandates such a result.  The Settlement Agreement states that Plaintiff shall receive "a royalty," which is singular, on specified "coal reserves."   According to Defendants, if the parties intended to provide for multiple royalties when the listed surface-only tracts were used, they would have worded the Settlement Agreement to grant Plaintiff "royalties" and to encompass more than merely "coal reserves."

As a rule, contracts must be construed as a whole and all writings that are part of the same agreement must be construed together.  See ABCO-BRAMER, Inc. v. Markel Ins. Co., 55 S.W.3d 841 (Ky. App. 2001); see also Veech v. Deposit Bank of Shelbyville, 128 S.W. 2d 907 (Ky. 1939) (instruments that are part of the same transaction may be interpreted together in determining the parties' intent).  However, the rule requiring contemporaneous construction "should not be applied

mechanically, arbitrarily, or without regard to the realities of the situation, especially when doing so would ignore an essential part of the contract or would be contrary to the apparent intention of the parties."  11 Williston on Contracts § 30:26 (4th ed. 2012).  In this case, the Royalty Agreements' grants, which are essential parts of the parties' understanding, explicitly provide that Plaintiff is entitled to a royalty when coal is "extracted" from "real property," which includes the listed surface-only tracts.  The Court refuses to construe the Settlement Agreement's references to "a" royalty on "coal reserves" as precluding Plaintiff from obtaining a royalty when coal is extracted from a listed surface-only tract.  Adopting Defendants' position would directly contravene essential parts of the Royalty Agreements, both ignoring the parties' references to extraction from real property and conflicting with the parties' listing of surface-only tracts in the royalty grants.  By using the words "or extracted" and "real property," the parties clarified their intent to grant Plaintiff a royalty when coal is extracted from a listed surface-only tract.  The Court chooses to effectuate this intent.

The Court finds it telling that the Royalty Agreements were in existence at the time that the Settlement Agreement was signed.  In fact, the Royalty Agreements and the Settlement Agreement were executed by the parties in respective single sittings.  By signing the Royalty Agreements, Defendants expressly conveyed an intention to make royalty payments when coal is "extracted" from "real property"–even though that language is missing from the Settlement Agreement.  If Defendants did not desire to make such overriding royalty payments, they should not have agreed to the Royalty Agreements' language.

Under Kentucky law, courts should decline to read a contract's more general provisions to address matters that are specifically addressed in other provisions of the same contract.  See, e.g.,

12

Briscoe v. Preferred Health Plan, Inc., 2008 WL 4146381, at *2 (W.D. Ky. Sept. 3, 2008) (holding that payment of administrative fees was governed by a plan's specific provisions for administrative fees and not a more general provision for charges); Newton v. N. Am. Specialty Ins. Co., 2010 WL 3825459, at *3 (E.D. Ky. Sept. 24, 2010) (holding that payment for a euthanized ataxic horse was governed by a policy's specific guidelines for ataxic horses and not a general humane destruction provision).  Here, the parties specifically addressed when royalties are triggered in their Royalty Agreements.  It is clear that the Settlement Agreement discusses royalties in a more general manner than do the Royalty Agreements.  As such, Defendants motion for summary judgment as to this issue is **DENIED**.  Likewise, Plaintiff's motion for summary judgment as to this issue is **GRANTED**.

However, while the Court agrees with Plaintiff that the parties must have intended the word "extracted" to mean something other than "mined," it does not believe that extraction should be so broadly construed that it covers all the work necessary to make coal marketable.  As to the pertinent definition, Plaintiff suggests that extraction must be defined to encompass all of Defendants' uses of the listed properties that assist in the production and sale of coal.  Thus, extraction not only covers the removal of coal from the ground through surface portals but also covers the removal of coal from surrounding waste material at preparation plants and the removal of coal from stockpiles for shipment.  (See WKRT's Mem. in Opp. to Defs.' Mot. for Summ. J. [DN 41] 25.)  Its proposed definition rests on Giersa v. Creech, where the court noted that:

> The term "extract" . . . evidently covers the whole work necessary to make marketable ore–mining, cleaning, and delivering to market, and, unless unreasonable should be applied to all ores found "in, upon, or under said lands." The work of lifting the ore from the ore bed to the surface is shown to be a small part only of what is necessary to market this ore. The ore cannot be said to be "extracted" until separated from the dirt and refuse in which it is found.

181 S.W. 588, 590 (Mo. Ct. App. 1916).  The Court finds, however, that Giersa does not control the

13

present case.  In <u>Giersa</u>, the lands contained several dump piles that included coal contained in rock and dirt that had been previously lifted from a mine shaft.  The court, in granting royalty payments on that coal, found that the coal was of little or no value in the condition in which it was and that the parties intended for payment of royalties when the coal was processed, cleaned, and shipped–even though it had already been raised to the surface.  <u>Id.</u> at 589–90.  In this case, though, the Court must read the term "extracted" together with the other terms in the Royalty Agreements to decipher the parties' intent.  <u>See</u> <u>L.K. Comstock & Co.</u>, 932 F. Supp. at 964 (noting that courts must "read the parts of the contract as a whole" and "seek interpretations which promote harmony between such provisions").  When this is done, it is clear that such a broad definition of extraction is unwarranted.

To ascertain the meaning of a term in an unambiguous contract, Kentucky courts often look to the definition of the term set forth in dictionaries.  <u>See</u> <u>Pizza Magia Intern., LLC v. Assurance Co. of Am.</u>, 447 F. Supp. 2d 766, 771–72 (W.D. Ky. 2006); <u>Davis v. Siemens Med. Solutions USA, Inc.</u>, 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005).  In dictionaries, the term "extract" is commonly defined as "to draw out or forth."  Black's Law Dictionary (9th ed. 2009).  This understanding is consistent with the term's normal meaning.  When read in the context of the Royalty Agreements, it is apparent that this meaning is qualified by the phrase "from all of the coal reserves and real property."  Indeed, the word "from" acts as a qualifier, indicating that to generate a royalty, the extraction must relate to real property (i.e. it must be "from" the fee simple interests or surface-only tracts).  The word "from" clarifies that the parties did not intend extraction to cover the coal's transportation, cleaning, or delivery.  Plaintiff, therefore, is not entitled to a royalty when the coal is processed and cleaned after the coal has been extracted from the ground.  Accordingly, Defendant's motion for summary judgment is **GRANTED** as to this issue.  Likewise, Plaintiff's motion is **DENIED**.  Plaintiff is

14

limited to receiving a royalty when coal is drawn out of the ore bed through a property's surface.

At this juncture, the Court wishes to briefly mention Plaintiff's claim regarding the selling of coal from a listed surface tract.  In its Complaint, Plaintiff asserts that it is entitled to a royalty "whenever coal is sold from their surface properties."  (Compl. ¶ 23.)  This argument, while not clearly articulated, appears to be based on the Royalty Agreements' language that a royalty should be paid on coal "mined or extracted **and subsequently sold**."  However, as noted by Defendants, the "subsequently sold" phrase is clearly a condition of the coal potentially subject to a royalty that must be satisfied before the payment obligation attaches.  (See Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. [DN-33]17.)  In fact, Plaintiff now acknowledges as much.  (See WKRT's Mem. in Opp. to Defs.' Mot. for Summ. J. [DN-41] 22 n.16.)  Therefore, to the extent that Plaintiff asserts it is entitled to a royalty simply because coal is sold from certain properties, its motion is **DENIED**.  Likewise, Defendants' motion on the issue is **GRANTED**.

### 3. "Overriding Royalty"

As a final matter, Defendants assert that they are entitled to summary judgment because the Royalty Agreements grant Plaintiff an "overriding royalty" on certain coal, and the term "overriding royalty" is a right to share in the production of "mineral rights."  According to Defendants, since the definition of "overriding royalty" is limited to mineral rights, the Royalty Agreements' language means that no royalty is due based on any use of the surface property.  In support, Defendants cite Zuhone v. Comm'r of Internal Revenue, 883 F.2d 1317 (7th Cir. 1989).  There, the court explained that an overriding royalty interest "is a right to share in the production value of mineral rights leased from the owner of land without any obligation for the cost of exploration or development of the land."  Id. at 1318 n.4 (citation omitted).  Plaintiff, by contrast, suggests that the term "overriding

15

royalty" should not be so narrowly interpreted, as it is instead a royalty that is paid to a recipient who does not own the property generating the royalty.  (See Aff. of Kenneth J. Schmidt, ¶ 9.) Plaintiff argues that any reliance on Zuhone is unwarranted, as the court in that case did not address the distinction between surface properties and underground reserves.  According to Plaintiff, the term "overriding royalty" does not indicate an intention to exclude royalties on the surface-only tracts.

The Court finds that the term "overriding royalty" is not ambiguous, as it is a right to share in the production of certain "mineral rights."  Courts across the country, in addition to Zuhone, have concurred in this conclusion.  See, e.g., Wedel v. Am. Elec. Power Serv. Corp., 681 N.E.2d 1122, 1133 (Ind. App. 1997) (stating that an overriding royalty is "a royalty interest in minerals located on property that the royalty holder (i.e. grantee) does not actually own"); Estate of Hatch v. NYCO Minerals Inc. 245 A.D.2d 746, 748 (N.Y. App. Div. 1997) (noting that the term "overriding royalty" is unambiguous and defining it as a "retained interest in minerals located on specific property that the royalty holder (i.e., the lessee) does not actually own").  But the Court's finding that the term is limited to the production of "mineral rights" does not entitle Defendants to summary judgment. In fact, Defendants cite no authority for the proposition that an overriding royalty is limited to mineral rights associated with underground reserves, as opposed to mineral rights associated with extraction of coal from surface-only tracts.  As discussed above, since a royalty is payable on certain minerals that are extracted through surface portals on the listed surface-only tracts, Defendants are not entitled to summary judgment on this basis.

Finally, the Court wishes to address Defendants' argument that Plaintiff is not entitled to surface royalties because Plaintiff does not own any surface interests under any of the conveyance

16

documents that might be burdened by the mining or extraction of coal.  (See Aff. of David R. Cobb, Ex. A1–B3.)  Defendants assert that while owners of surface interests may be compensated, Plaintiff cannot be compensated here because it holds no interest in the listed surface tracts.  See Taylor v. Coal-Mac, Inc., 864 S.W.2d 302 (Ky. App. 1992) (stating that for a surface owner to be entitled to surface royalties, he must "be in actual or constructive possession of the property").  Plaintiff counters by maintaining that Taylor does not apply in cases that involve rights arising under freely-negotiated contracts between sophisticated parties.  According to Plaintiff, the court in Taylor was analyzing a purported reservation, in a deed by a seller of surface tracts overlying mineral properties, of the right to contract for surface royalties from mineral owners.  These facts are distinct from the present case, as Plaintiff is not seeking to control Defendants' use of any property and Defendants' obligation to pay is not dependent on who owns the property, but on the Royalty Agreements' terms.

The Court agrees with Plaintiff that Taylor is inapplicable, and that the basis for computing royalties under the Royalty Agreements should depend on the parties' freely-negotiated agreements.  While the Royalty Agreements do not entitle Plaintiff to payment any time a surface tract is used, they do, as discussed above, allow for payment when coal is extracted through a surface portal on a listed surface-only tract.

As a related matter, the Court must address Plaintiff's argument that it is entitled to multiple royalties when coal reserves which are included in one grant are mined, and those reserves lie under a surface-only tract of another grant but are not extracted through a surface portal on that surface-only tract.  For example, Plaintiff asserts that it is entitled to a Ceralvo royalty and a Western Land royalty if Ceralvo coal reserves that are located under a Western Land surface-only tract are mined.  (See Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [DN 35-2] 15.)  This argument is based on

the Royalty Agreements' definition of "Gross Sales Price," which is found in § 4 of the Armstrong-WKRT Royalty Agreement and § 2 of the Ceralvo-WKRT Royalty Agreement.  It states that the "Gross Sales Price" is the "total sales price charged for coal mined and extracted from the subject property . . . regardless of whether such coal is leased or fully or partially owned (**or located under the surface property described herein**)."  According to Plaintiff, this language shows that the parties' royalty obligations also apply to coal that is located underneath the listed surface tracts.

The specific arguments asserted by Plaintiff are three-fold.  First, Plaintiff argues that it is owed an additional royalty for coal reserves mined under surface tracts because the Gross Sales Price definition is expressly referenced by the language in §§ 1 and 2 of the Armstrong-WKRT Royalty Agreement.  In this regard, Plaintiff relies on *In re* Payne for the proposition that where a term is defined in a contract, the term will be accorded that meaning wherever it appears.  450 B.R. 711, 720 (Bankr. S.D. Ohio 2011).  Thus, the Western Diamond and Western Land grants are properly read as follows:

> [Grantor] . . . hereby grants to WKRT and agrees to pay WKRT an overriding royalty . . . in the amount of one-half of one percent (0.5%) of **[the total sales price charged for coal mined and extracted from the subject property . . . regardless of whether such coal is leased or fully or partially owned (or located under the surface property described herein)]** . . . of all coal hereafter mined or extracted and subsequently sold from all of the coal reserves and real property described in, and conveyed, demised or otherwise granted in or under, the following deeds and instruments.

According to Plaintiff, this language shows that Defendants owe an additional royalty because the mined coal is located under the listed surface tracts–at least with respect to the Western Diamond and Western Land grants.

Second, Plaintiff argues that it is owed an additional royalty for reserves mined under surface tracts because the Gross Sales Price definition clarifies the scope of the royalty grants.  Plaintiff

highlights that the Armstrong and Ceralvo grants do not refer to the Gross Sales Price definition, yet the parties still included the language in their Royalty Agreements.  According to Plaintiff, Defendants cannot offer any explanation for the presence of the language in the Ceralvo-WKRT Royalty Agreement if it was not meant to clarify the grants' scope.  Moreover, ignoring the provision in the Ceralvo-WKRT Royalty Agreement is contrary to Kentucky law.  See Am. Dairy Queen Corp., 753 F. Supp. 2d at 675 (noting that a court must interpret the contract as a whole).

Third, Plaintiff argues that it is owed an additional royalty for reserves mined under surface tracts because the Gross Sales Price section provides for a royalty on "any coal recovered from any slurry ponds, gob piles, fines and other processing refuse already located on the subject property." This language allegedly refers to more than the method of calculating the Gross Sales Price.  Instead, it serves to clarify the parties' intention to provide for royalty payments on all of the coal mined by Defendants that lies within the metes and bounds of the instruments listed in the four royalty grants.

Defendants counter by suggesting that the Gross Sales Price definition is not a granting provision.  Rather, it is only relevant in determining the amount of the Gross Sales Price to be used in calculating the Western Diamond and Western Land royalty payments under the Royalty Agreements.  According to Defendants, the Gross Sales Price definition does not apply to calculating royalties for Armstrong or Ceralvo, and if the parties had intended for an additional royalty to be paid on coal mined that underlies the surface tracts, they would have included language to that effect in the grants themselves.  By placing the language in the definition section, however, the parties merely ensured that the Gross Sales Price calculation would take into account all of the coal sold from a single surface portal (regardless of whether the coal was subject to a royalty payment to Plaintiff).  Calculating the Gross Sales Price by multiplying the tonnage of coal and the

sales price for all coal that is mined from a portal makes easier the calculation of the royalty due and protects Plaintiff's interests by ensuring that both the high and low coal sales are included in the calculation.

The Court finds that the Royalty Agreements' unambiguous terms support Defendants' position. In <u>Poundstone v. DEW Resources, Inc.</u>, the Sixth Circuit ruled that the plaintiffs were entitled to a royalty on the sale of coal produced from certain property ("the Allen lease") because the parties' agreement entitled the plaintiffs to payment "based upon the sale of coal by Buyer which has been produced from Area I" and the Allen lease was "clearly . . . within Area I." 75 Fed. App'x 353, 363 (6th Cir. 2003). However, contrary to Plaintiff's contention, the parties in this case did not agree that a royalty was due on coal simply because it was located under a surface tract. Instead, the parties included the language "regardless of whether such coal is leased or fully or partially owned (or located under the surface property described herein)" in a definition section.

As an initial matter, the Gross Sales Price definition cannot operate as a royalty-generating mechanism with respect to either the Armstrong Coal or the Ceralvo grants. The grants do not refer to the Gross Sales Price at all, instead basing the calculation of royalties on an agreed-upon amount per ton. Moreover, the Court finds that the Gross Sales Price definition does not operate as a royalty-generating mechanism with respect to either the Western Land or the Western Diamond grants for the following reasons.

Under the Western Land and Western Diamond grants, the Gross Sales Price definition is **only** triggered when coal is "mined or extracted and subsequently sold" from the listed "coal reserves and real property." Thus, as to surface-only tracts, a royalty is only due–and the Gross Sales Price definition is only applicable–when coal is "mined or extracted" from a tracts' surface.

20

As earlier noted, coal cannot be mined from surface tracts, as there are no minerals in the surface to mine. But coal can be extracted through a surface portal. Therefore, the grants' plain terms only allow an additional royalty to be paid if the coal reserves that are located under one of the listed surface-only tracts are extracted through a portal on the surface. This is not what Plaintiff argues here.

The Court concludes that the Gross Sales Price definition section is merely that–a definition section. It explains to the parties how to calculate the Gross Sales Price on which royalty payments are based. The Royalty Agreements' plain and unambiguous terms do not somehow create another separate situation under which Defendants owe royalties. The parties, as well as their attorneys, are sophisticated and knowledgeable. If they truly intended the result advocated for by Plaintiff, they would have inserted a provision to that effect in their royalty grants themselves. Accordingly, Defendants' motion is **GRANTED** as to the issue of royalties for coal underlying a listed surface tract. Likewise, Plaintiff's motion is **DENIED** as to this issue.

### B. SUBSEQUENTLY-ACQUIRED COAL

Plaintiff next argues that the Royalty Agreements clearly indicate the parties' intent to require royalty payments for coal that is "mined or extracted and subsequently sold" from coal reserves and real property, regardless of whether those reserves or real properties were acquired by Defendants prior to, or after, the date on which the Agreements were executed (namely, July 25, 2008). Plaintiff asks the Court to interpret the Royalty Agreements as providing for payment on subsequently-acquired coal in two limited instances: (1) where the coal underlies the listed surface tracts; and (2) where the coal is extracted from the listed surface tracts. Defendants maintain that Plaintiff is not entitled to a royalty on any subsequently-acquired coal. The parties' arguments are

21

analyzed in turn.

In support of its position, Plaintiff points to the Royalty Agreements' language, as well as to the Settlement Agreement's language.  Plaintiff highlights that rather than stating that royalties are not due for any subsequently-acquired coal, the Royalty Agreements state: "**Other than as set forth herein**, WKRT acknowledges and agrees that it is not owed or entitled to the payment of any other royalties . . . ." (See Armstrong-WKRT Royalty Agreement § 11.6; Ceralvo-WKRT Royalty Agreement § 9.6 (emphasis added).)  Also, rather than stating that royalties are not due for any subsequently-acquired coal, § 9 of the Settlement Agreement states: "**Other than as set forth above**, [Plaintiff is] not owed any additional royalties by the Armstrong Parties, and shall not be entitled to any royalty payments related to any coal reserves or properties acquired in the future by the Armstrong Parties."  Plaintiff maintains that if the parties intended the royalties to be excluded in cases where subsequently-acquired coal was mined, they would not have qualified their statements to this effect with the phrase "other than as set forth [herein or above]."

Defendants articulate two counter-arguments in regards to Plaintiff's claim for subsequently-acquired coal.  First, Defendants argue that Plaintiff is not entitled to royalties on subsequently-acquired coal because § 9 of the Settlement Agreement states that these royalties are not payable, using the express language that Plaintiff "**shall not be entitled to any royalty payments related to any coal reserves or properties acquired in the future** by the Armstrong Parties."  Second, Defendants argue that the Royalty Agreements do not provide for royalties on subsequently-acquired coal; thus, there is nothing "herein" or "above" to which the "other than as set forth" phrases relate.

The Court finds Defendants' arguments more persuasive.  First, the Court holds that Plaintiff is not entitled to a royalty on subsequently-acquired coal that is merely underlying the listed surface

22

tracts.  As discussed above, the Royalty Agreements' unambiguous terms do not entitle Plaintiff to royalties on coal that simply underlies the listed surface-only tracts.  The Court finds that this is true regardless of whether the coal was owned when the Royalty Agreements were executed.  Second, the Court holds that Plaintiff is not entitled to royalties on subsequently-acquired coal that is extracted from the listed surface-only tracts.  This holding requires a closer analysis.

Under Kentucky law, the Settlement Agreement must be read in connection with the Royalty Agreements.  When this is done, it is clear that the parties did not intend to provide for royalties on subsequently-acquired coal.  Section 9 of the Settlement Agreement explicitly states that Plaintiff "shall not be entitled to any royalty payments related to any coal reserves or properties acquired in the future by the Armstrong Parties."  No reasonable person could view this language and conclude otherwise.  Notably, the Royalty Agreements fail to provide for royalties on subsequently-acquired coal.  If the parties had intended for these royalties to be paid, the grants would indicate as much.

In this regard, the Court notes that Plaintiff's reliance on the phrase "other than as set forth [herein or above]" is unwarranted, and the Court refuses to adopt Plaintiff's interpretation of the parties' contracts.  As to the Royalty Agreements, the language is: "Other than as set forth herein, WKRT acknowledges and agrees that it is not owed or entitled to the payment of any other royalties . . . ."  As to the Settlement Agreement, the language is: "Other than as set forth above, [Plaintiff is] not owed any additional royalties by the Armstrong Parties, and shall not be entitled to any royalty payments related to any coal reserves or properties acquired in the future by the Armstrong Parties."  The Court finds that this language does not indicate that royalties on subsequently-acquired coal are due.  Instead, the language merely shows that the parties agreed to certain royalty grants, outlined those grants in their agreements, and agreed that Plaintiff is not entitled to any royalty payments other than those listed in the grants.  It is simply implausible to believe that Plaintiff is entitled to royalties on subsequently-acquired coal based on this language.

23

The Court's construction is consistent with the rules of grammar.  In *In re* Tanguay, the court applied the fundamental rules of grammar in construing a statute, noting that "a comma preceding a coordinating conjunction links independent clauses." 427 B.R. 663, 671 (Bankr. E.D. Tenn. 2010). It then held that a "for personal use clause" could not be interpreted to modify the phrase "any other thing of value" because the phrases were independent of one another.  Id.  In this case, the comma preceding the coordinating conjunction "and" in the Settlement Agreement mandates the same result.  It clarifies that the phrase "other than as set forth above" modifies the statement that Plaintiff is not owed any additional royalties by the Armstrong Parties.  It does not modify the independent phrase that Plaintiff shall not be entitled to subsequently-acquired royalties.  Therefore, Plaintiff's motion for summary judgment is **DENIED** as to this issue of subsequently-acquired coal.  Similarly, Defendants' motion for summary judgment is **GRANTED** as to this issue.

### PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTIONS TO PLAINTIFF'S  FIRST EVIDENTIARY SUBMISSIONS [DN 66]

Plaintiff has moved to strike Defendants' Reply to Plaintiff's Response to Defendants' Objections to Plaintiff's First Evidentiary Submissions [DN 66].  In support, Plaintiff first suggests that the reply, consisting of 176 pages, exceeds the 15-page limitation on reply memoranda set forth in LR 7.1(d).  Local Rule 7.1(d) provides, in pertinent part, as follows: "Limitations on Memoranda. Supporting and opposing memoranda may not exceed forty (40) pages without leave of Court. Reply memoranda may not exceed fifteen (15) pages without leave of Court."  Plaintiff also suggests that the reply is not an authorized filing since Defendants' Objections to Plaintiff's First Evidentiary Submissions [DN 64] are improper efforts to devote more argument than LR 7.1(d) allows to its opposition.  In response, Defendants argue that their reply is reasonable, as it relates to a number of evidentiary disputes in this action.  Moreover, Defendants claim that the reply is not subject to LR 7.1(d), which specifically governs the filing of "motions."  Defendants state that their Objections

to Plaintiff's First Evidentiary Submissions are authorized by Fed. R. of Civ. P. 56(c)(2), which allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  In this case, the Court finds it unnecessary to grant Plaintiff's motion because it has refused to rely on extrinsic evidence in interpreting the unambiguous language of the parties' Royalty Agreements.  As such, Plaintiff's motion is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [DN 31] is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to Plaintiff's claim for royalties on subsequently-acquired coal and as to most of Plaintiff's claims for multiple royalties, as discussed above.  It is **DENIED** as to whether the Royalty Agreements provide for royalties when coal is extracted through a surface portal from a listed surface-only tract.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment [DN 35] is **GRANTED** in part and **DENIED** in part.  It is granted as to whether the Royalty Agreements provide for royalties when coal is extracted through a surface portal from a listed surface-only tract. It is **DENIED** as to its claim for royalties on subsequently-acquired coal and as to its other claims for multiple royalties, as discussed above.

**FURTHER** that Plaintiff's Motion to Strike Defendants' Reply to Plaintiff's Response to Defendants' Objections to Plaintiff's First Evidentiary Submissions [DN 66] is **DENIED**.

*Joseph H. McKinley*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

November 27, 2012

cc: counsel of record